FOURNET, Justice.
 

 This is an action in jactitation or slander of title instituted by the owner in fee of the property, against - his authors in title, who, in their deed to him, had reserved-an undivided one half interest in the oil, gas, and other minerals in and under the property, and who subsequently executed a lease to explore said minerals to their co-defendant, R. O. Smith.
 

 The defendants answered, admitting the alleged act of slander, and averred that at the time this suit was filed the servitude and lease were both in full force and effect, in that an oil and gas well was drilled and
 
 *979
 
 completed on the property by the defendant Smith in good faith, in compliance with his contract of lease, prior to the expiration of the ten’year prescriptive period.
 

 On the day of the trial plaintiff pleaded the prescription of ten years liberandi causa. The lower court rendered judgment in favor of the defendants and dismissed the plaintiff’s suit. He has appealed.
 

 The plaintiff, James W. Lynn, acquired from the defendants, Hazel C. Harrington, Mattie C. Palmer, David C. Cummings, and Mary C. Brodnex, by deed dated April 30, 1928, a tract of land situated in what is known as the Pine Island Oil Field in Cad-do Parish, described as being the N.W.
 
 Vi
 
 and -N. y2 of the S.W.
 
 Vi,
 
 Sec. 20, Tp. 21 N., R. 14 W., for a consideration of $36,-000. The deed contained the following stipulation:
 

 “There is reserved and excepted from this sale an undivided one half interest in and to all the oil, gas and other. minerals on, in and under the above described property, together with the right of ingress and egress for the purpose of mining for and producing the same.”
 

 On February 9, 1938, the above named vendors executed an oil and gas lease of this mineral reservation in favor of their co-defendant R. O. Smith, who obligated himself as the consideration therefor to begin drilling operations on the premises within twenty'days, and to prosecute the same with due diligence to the depth of the Woodbine sand, unless oil or gas should be discovered in paying quantities at a lesser depth. Smith began actual drilling on the well on March 3, 1938, and completed same on March 13, 1938, but the result was a failure.
 

 Plaintiff contends, however, that the drilling 'of the well in this case did not have the effect of interrupting the prescription then accruing, in that the well was not drilled according to the requirements and within the contemplation of the articles of the Revised Civil Code and the jurisprudence of this state, and, therefore, that the defendant failed to bear the burden of proving the interruption of prescription.
 

 “Where a vendor reserves the right, in conveying land, to exploit the land for minerals, the reservation is the retaining of a servitude on the land for that purpose.” Keebler v. Seubert, 167 La. 901, 120 So. 591, 592. Such rights may be lost in ten years by nonuse for that period. Articles 789 and 3546 of the Revised Civil Code. But, “Where a person, owning such a servitude, enters upon the land to which the servitude attaches within the ten-year period, and there,
 
 in good
 
 faith> drills wells for the purpose of exploiting for minerals, he is thereby exercising the right reserved by him, or using the servitude retained, within that period, for the purposes, for which it was retained. The right to the continued use of the servitude retained is not dependent upon the successful outcome of the exploiting, unless it be made so by contract.” Keebler v. Seubert, supra. (Italics ours.) See, also, Frost-Johnson Lumber Co. v. Salling’s Heirs, 150 La. 756, 91 So. 207, 209; Wemple v. Nabors Oil & Gas Co., 154 La. 483, 97 So. 666; and Lee v. Giauque, 154 La. 491, 97 So. 669.
 

 
 *981
 
 This court has held that “To use a servitude, so as to interrupt prescription, is "to use it in the manner contemplated by the grant or reservation. * * *” Louisiana Petroleum Co. v. Broussard, 172 La. 613, 135 So. 1, 2. See, also, Goldsmith v. McCoy, 190 La. 320, 182 So. 519.
 

 The sole question presented, therefore, is whether or not, according to the facts of this case, the prescription has been interrupted. We think this question has been correctly disposed of by the trial judge, in his written reasons for judgment, as follows:
 

 “In accordance with its (the lease’s) terms, on March 3d, he (Smith) commenced -the actual drilling of a well which, by drilling day and night he completed as a dry hole on March 13th at a depth of 2311 feet, and at a drilling cost of $4,059.-00.
 

 “By drilling straight ahead he could have reached the depth in three days. Instead he drilled carefully, taking, in all fourteen cores, from the Nakatoch sand at from 887 to 906 feet, the chalk rock formation at from 1462 to 1652, the Blossom sand at 1917 and the Woodbine at about 2236. All of these cores were submitted to geologists for careful analysis. There being no other known horizon, the well was plugged in at 2311 feet.
 

 * * * * * *
 

 ■ “This well was not drilled as a mere gesture by the mineral owners to preserve a servitude, but by the owner of a mineral lease under an obligation to substantially develop with due diligence. The well was a compliance with that obligation in every particular. That the well was drilled through every known producing strata is best shown by an examination of the map 'of the Pine Island Field, filed in evidence. * *
 
 *
 
 Of the hundreds of wells shown, only one appears to have been drilled beyond the Woodbine sand. That one. is just north of the property and is 4,395 feet deep and a non-producer.
 

 “It is true that of eight wells along the north line one produced only a small quantity of oil, and another is being pumped at 915 feet only intermittently, and that just south of the property of three wells, only one at 2,246 feet is a producer. These developments do not condemn the property for the reason that the sands in this field are lenticular, consisting of ‘hickeys,’ ‘hot spots,’ or ‘small highs.’ In such an area the' oil is found in small • isolated pools. The character of adjacent wells does not prove territory a short distance away. Some of these lenses have produced fabulous amounts of oil.
 

 “The testimony shows that one practical oil man, Rice, almost leased the property and that another, Driscoll, who had drilled fifteen wells getting eleven producers, made an offer to drill the tract-for actual cost, depending for his profit on production.
 

 “We have read the expert testimony with deep interest. The most we can gather from the geologists is that their opinions are very fallible. That the most they can do is to" point out what they consider the most likely place to drill, with no assurance as to results. That the determining opinion in drilling oil wells is that of the
 
 *983
 
 man sinking and paying for the well. That many fields have been developed in territory condemned by geologists.
 

 “Taking all these things into consideration along with the legal presumption of good faith, we cannot agree with the contention that this well was drilled without, in the opinion of the driller, a reasonable prospect of success. That the well was a failure is of no moment. The servitude consisted of the right to go upon the land and explore for oil, it was not confined to the actual production of oil.”
 

 For the reasons assigned the judgment of the lower court is affirmed at appellant’s cost.
 

 O’NIELL, C. J., does not take part.